Good morning, Your Honors, and may it please the Court, my name is Regina Sperley, and I represent the Plaintiff and Appellant Lane Stoll. I want to start, first of all, I want to reserve three minutes for rebuttal, please. I want to start with a quote from Nazir v. United Airlines. Many employment cases present issues of intent and motive and hostile work environment, issues not determinable on paper. Such cases, we caution, are rarely appropriate for disposition on summary judgment, however liberalized it be. In a colorful language of Chief Judge Wald, quote, it's flame lit by Matsushita, Anderson, and Silatec, summary judgment has spread through the underbrush of undesirable cases, taking down some healthy trees as it goes. This case is a healthy tree. As Lindahl v. Air France held, any indication of a discriminatory motive may suffice to raise a question that can only be resolved by a fact finder, even in Kama v. Mayorkas. Can I ask you with regard to your retaliation claim, what do you have other than temporal proximity? Your Honor. Retaliatory motive. Yes, Your Honor, which of the retaliation claims, because we have retaliation under 1102.5, we have FIHA retaliation. Well, let's just break it down. Let's do the July 2019 warning. Other than temporal proximity, what do you have? So, and again, are we talking about 1102.5 or FIHA? The reason it matters. Let's do retaliatory motive evidence. I don't really see anything other than temporal proximity. In your 28-J letter, you say you have other evidence, and so I'm just asking you, what were you referring to in your letter that you filed yesterday? Okay. That's my question. Here's, okay, here's the sequence of events, and this is all briefed, and this is all in the record. But if it's sequence of events, then that's temporal proximity, right? Well, it's no, because there's also, there's a declaration and deposition testimony from Mr. Stoll stating that he was told by his superiors, including Richard Cripps, the general manager, including Jay Harrison, who was at the time in 2017 the corporate head of HR, that people who make complaints will be labeled as troublemakers, will be blacklisted. That is paragraph 18 that the district judge said was sham affidavit and struck, right? That was, that partially is in paragraph 18. That also appears in other paragraphs that were not stricken, or that were considered, were not held to be a quote sham, and we could talk about that as well. But that is also all over his deposition testimony. And I sat through that deposition, and it is in the record, in the excerpts of the record before your honors, it is, it was in the record before the district court. He was, Mr. Stoll was asked, why do you think that this company would retaliate against you for making complaints? And his testimony was, I have personally seen it, I have personally witnessed incidents of at least two employees who made complaints prior to me who were retaliated against, who were driven out of the company, and who were terminated. He was asked for the names of two employees. He gave those names. He was asked, what more evidence do you have? Why else do you think this way? And he said, Jay Harrison told me that people are going to be trouble, labeled troublemakers, and they're going to be blacklisted. He, what other evidence do you have? Why else do you think this? So it's Mr. Stoll's declaration in his deposition testimony. Well, yes, because, because your honor, I'm sure you can understand. And as even comma points out, that the minimal burden on summary judgment about retaliatory intent and discriminatory motive is going to be very low. Very little evidence is necessary for this. Why? And I'm going to quote from comma, the minimal burden is doubtless justified by the fact that those discriminating against a person because of that person's protected activity may not, in their statements and documents, create direct evidence of discrimination, though the claim against them is equally. And who, who do you assert was involved in the decision to fire Mr. Stoll? That a different group of people than what was argued to the district court, always the same? It's, yes, it's everything that I'm arguing here before you is exactly the same as what was argued to the district court. And so who, who was involved in the decision to terminate Mr. Stoll? Based on what we discovered through discovery that was made at the corporate level in corporate HR. Yeah, but who, who can you name? I, I called in a decision to terminate Mr. Stoll. I can only surmise from what the evidence is that it could only be Kurt Schrock, which was the corporate HR. Kurt Schrock, because in 2019, he had emailed Brian Piedmont, who was the president of the business unit, asking for what do you have on Lane Stoll? That's an issue. He was looking for issues. You have that email in the, in the excerpts before you. That was before the district court. That was in the separate statement. That was in my briefing. And then, other than Mr. Schrock? I'm sorry? Anyone other than Mr. Schrock? As far as the decision to terminate Mr. Stoll? Brian, Mark Petrosky may or may not have been involved because you have Mr. Schrock. Mark Petrosky was the new general manager, if you recall. He replaced Richard Cripps when Richard Petrosky and Kurt Schrock, because the testimony from Mark Petrosky, from Ms. Burkett, and the email from Kurt Schrock shows that Kurt Schrock was the one who authored the termination letter for Mr. Stoll. And the termination letter was those written. Other than Mr. Schrock and Mr. Petrosky? I'm sorry? Anyone other than Mr. Schrock and Mr. Petrosky? From what the evidence shows, no. Well, hold on. I mean, I'm not trying to make your argument for you, but the email that Schrock sends sends to Thompson, Petrosky, and Burkett and says, give me your thoughts and ideas. True. So, wouldn't you, wouldn't you then say that anyone who's on the email, which is the draft letter of termination, had some involvement in the termination? I would, yes. And thank you for that. But yes, I would agree that at minimum, all those players, all of those players were involved in that decision-making. The reason that I don't necessarily highlight Araceli Burkett, even though she probably was the player, she is on the email, she is contributing to this decision-making, but I don't highlight her because it's undisputed that by the time Burkett comes in as local HR, Mr. Stoll did not, you know, personally complain to her about the wage and hour violations. So let me just, I want to make sure I understand the timeline as you see it. Okay, so we have July 31, 2019, there's the warning letter from Schrock and Cripps, correct? Correct. All right, now I'm going to fast forward to February, March of 2020, because to me, this is very important because I, Judge Koh, I think hit on something. This is a temporal proximity case. I know you have a little bit more than that, but it's largely proximity in terms of time. So I just want to make sure I understand the timeline as you see it. Okay, so there is this meeting, according to your client, late February, early March of 2020. Yes. Meets with Petrosky. That's when Petrosky makes the comment about, oh, you know, we fired the, I fired the guy at Tolleson. And then that's when your client claims that he said, we've got wage and hour problems here at the plant, correct? That is correct. But also, don't forget, in the same time frame, his performance review gets downgraded for the first time in six years. Okay, so same time frame. So just stick with me here for a second. So again, the dates are important to me. So then you go, your client goes to Hawaii. Yes. And that was as best as I can tell, March 2nd to March 6th of 2020, correct? All right. Then you have the punch card report from Ms. Flores. I know you dispute that, but I'm just, like my timeline, that's March 5th. So it's while he's in Hawaii that comes out, correct? Correct. Then we have March 9th. Garcia and Mariscal confirmed the punch card story that Flores related. March 10th, Monday, stole back from Hawaii. He's interviewed and suspended. On the 12th, we have that letter that circulated. Then on the 13th, he's terminated. Is that timeline basically correct? Basically, yes. Although... What am I missing? Well, I think you got all the major points, but we absolutely contest, unlike many of the cases that are cited by in the respondent's brief, we absolutely contest the validity of any of these... Sure, understood. I'm not saying you agree with any of these things. I'm just trying to get the timeline because in your client's deposition, I was looking at 6ER991. He says that within three working days of meeting with Petrosky, I was suspended and then terminated. But as best as I can tell, it was not three working days. It was more than... I'm not saying that's fatal to the case. I'm just trying to understand the timing here. He says in his deposition, well, within three business days, I was suspended and then terminated. If I'm looking at this timeline, it was more than three days. I think the three days is where he has a conversation with Petrosky, the last conversation with Petrosky about the wage and hour issues, about what's going on at the plant. So is he saying three working days because he was gone in Hawaii? I'm trying to count the... I'm literally trying to count the days here. I think it's... Yes, because it's... Because he's saying that when I was in Hawaii, those were not working. Okay, that's what I'm trying to... Because again... For him, yes. If this case rises and falls on temporal proximity, it's important for me to know what the temporal proximity is. But I don't think it rises and falls just on temporal proximity. I understand you have... Proximity plus, I understand that. But I think if you don't have temporal proximity, I think you're in real trouble in this case. So I think you're... I understand why you say proximity plus, but if it's plus without proximity, I think you're in trouble. So I just want to make sure I understand the timeline. Okay. And I have lots of questions for the other side about the proximity. So don't read my questions as though this is bad for you. I just want to make sure I understand because in comma, it was 56 days. And this is a much tighter window than that, you would say. I would say that this is a tighter window, but there are also cases that I cited where the proximity is three months, right? And I'm sure that there's a whole body of law where the proximity is more than three months, right? Because at the end of the day, when you have cases that involve motive and intent, it's always going to come down to the totality of the circumstances and a very intensive fact inquiry about who did what to whom at what point in time and who said what to whom. The people you didn't mention as to who was involved in terminating Stoll are the two people who said you don't understand because you're Canadian, Crawford and Bodie. You would agree that Crawford and Bodie were not involved in Mr. Stoll's termination, right? Yes and no. Why is it yes? Bodie left the defendant's employment before Mr. Stoll was even terminated. Yes, but Bodie was the predicate for the July 2019 write-up. That was a statement that came from him to Kurt Schrock and that materialized into a write-up which Richard Cripps then said, I'm sorry I was forced to give this to you. That's in the testimony of Lane Stoll. But you know the things that are in that July 2019 write-up are in all of his reviews. Even if he gets an overall good rating, all of the reviews say he's arrogant, he doesn't listen to us, he makes us feel disrespected. So that's not... I guess my question is, so you're saying Bodie was involved. I guess I've asked you like five or six questions who was involved in the termination of Mr. Stoll. You never once mentioned Crawford and Bodie. Well, now you're saying Bodie was involved. Bodie was involved in terminating even though the employment terminated with the defendant before Mr. Stoll was terminated. You're asking me a question I can't answer yes or no because there's shades of gray, right? The shade of gray is that Bodie was involved in the 2019 write-up. Yes, at the time of the termination, Bodie's no longer with the company. So of course he couldn't have contributed to the decision. Why didn't you mention Bodie when I asked you five or six times who was involved in the termination of Mr. Stoll? Well, if Bodie was in fact involved. I mean for your national origin discrimination claim, it hinges on the you don't understand because you're Canadian. So that's a pretty key person, right? What about Crawford? Do you agree Crawford was not involved in the termination of Mr. Stoll or not? I agree that there is no evidence that I've uncovered that Crawford was involved. I will put it to you that way. The national origins discrimination claim, I mean what's the evidence that he was discriminated against for being Canadian? I just don't see it here. Okay, two major things. Number one, the comments that were made. But he doesn't recall the context, right? You don't know because you're Canadian. It could be a valid point and someone could have said, you're at the one yard line and he didn't understand it. Well, yeah, you don't understand because you're Canadian. You don't play football there. What fourth down is in Canada. So I mean, so without the context, it could just be a stray remark. Okay, but he said that the whatever remark was made, it was in the air of you're stupid because you're Canadian. You don't understand this. But the bigger issue is how he's treated as opposed to the three superintendents who intentionally, knowingly violated labor laws by fraudulently signing off on wage. But when Mr. Stoll signed the one form saying that Carla Flores did take her lunch break, he didn't know. He's her supervisor. You're saying that he unwittingly signed that one without knowing that she hadn't in fact taken her lunch break? He's two levels above her though, right? In between him and Flores are the superintendents. And on top of which, Flores later gets fired for time fraud herself. Okay, so you're saying when he signed it, Flores defrauded him? Yes. Yes, that is exactly what I'm saying because he has no knowledge as to whether she is on the floor or not. He's two levels removed from her. So if she's saying she is, he has no way of knowing that. But the three superintendents who are directly her supervisors, they know because they watch her. They're her direct supervisors. And back to your point, Your Honor, about race discrimination, you have four people accused of time fraud. Three of them are Hispanics admit to knowingly signing off on fraudulent forms. Does your discrimination claim a race one, Hispanic versus white? Or is it Canadian versus American? Which one is it? Because in the brief, it seems like you're arguing it as a Hispanic versus white discrimination. Because Burkett is Hispanic. The three supervisors who are below Mr. Stoll are Hispanic. Ms. Flores is Hispanic. Right. Let's just put it this way. He's Canadian. The rest of the players in this whole sequence of events is not. What is the significance that they're Hispanic? The three supervisors below Mr. Stoll, Ms. Flores and Ms. Burkett, head of HR, is there racial discrimination based on Hispanic versus Caucasian? Well, that's what the evidence shows, basically. Because if you have four people accused of doing exactly the same thing, one of them is terminated, allegedly for this time fraud, who is non-Hispanic. And then you have three Hispanics who are all on the same level in the material respect. Ever raise a race claim based on Hispanic versus white? Well, it's a national origin claim. It's pled as national origin, right? Canadian is white and American is Hispanic? I'm unclear on the relationship then. Well, they're not American. They're Hispanics from Latin-based country. They weren't necessarily born here. And all three of them reported to Stoll, right? And I think all three of them claimed they were afraid of Stoll, so they just followed along. So it seems like you can differentiate between them. You know, the buck stops at the top. Right. But again, if we're going to look at similarly situated, yes, they all three report to Stoll, but they all equally share the responsibility of making sure that wage and hour laws are met. And in fact, they, the three superintendents, have an even bigger responsibility than Stoll does to make sure that the wage and hour issues are addressed, because they're the direct reports of the hourly employees. He's not. The hourly employees, they're not his direct reports. And I specifically asked the three of them, between them and Stoll, in deposition when I deposed them, between them and Stoll, who was actually responsible for ensuring wage and hour more responsible than Mr. Stoll is, as far as ensuring this. And so, and we have the four of them alleged to have done the time fraud, but only one of them gets terminated. And Ms. Burkett testified that the time fraud is such an important issue and it's such a terrible violation. And it's just, you know, for this thing to happen, it's just fraudulent and it's horrible. Why are the four of them not fired? All, if we're going to apply this equally, if this is truly a concept, that this is a horrible thing that these people did, the four should get fired. And then I would have, then I may have had a problem. But here, they're distinguishing between Mr. Stoll and the three, and the three superintendents. And you think that's because he's not Hispanic? Yes. It's because he's not Hispanic and it's because he is making complaints. The other three never made complaints about anything to anyone. They kept quiet. They kept their head low. So it's not that he's Canadian. It's that he's not Hispanic. That's the basis of your discrimination claim. Well, being a Canadian is also being not Hispanic. I mean, those, that's the same. You don't think there's any Latinos in Canada? Well, I'm sure that there are, but it's as far as the allegations of this case, as far as the facts going to this case, I'm not going to, you know, make broad, you know, sweeping statements. You think all Canadians are Caucasian? I don't, I don't know. And I mean, I can't answer that. And I don't think that that's really relevant. What's relevant is that in this particular case and under these set of facts, the fact that he is Canadian means that he is also not Hispanic. He's not Hispanic. Well, I think maybe, again, not trying to make the argument for you, is that you're saying that there were four people who are alleged to have engaged in certain behavior. The only one who was punished was Canadian and the others aren't Canadian. Correct. Okay. And I don't think we need to get into whether they're Hispanic or not Hispanic. Just he's Canadian. They're not. And your point is that you think he got targeted because he was Canadian. Because he's Canadian and because he makes complaints. Right. And so he's- Then those are two grants. All right. We're way over time. So what I'm going to do, I'm going to give you two minutes for rebuttal. Okay. That's fine. And then we'll hear from the other side. That's fine. And I'm sorry if I offended you, Judge Cope. I didn't mean to, you know, make race-based comments. I'm just trying to answer your question as best as I can. I'm not all offended. I'm just trying to understand your national origin. Okay. I'm really just asking questions so I can understand the case better. Thank you. Good morning, your honors. May it please the court. My name is Matthew Morrison and I represent the defendant's appellees. Your honors, I think you're right. This case hinges on the labor code retaliation claim and to what extent temporal proximity should be considered. And what additional evidence there is that the termination decision was motivated by retaliatory animus. I want to start with the second part of that first. What additional evidence, or excuse me, what evidence is there that any of the decision makers or alleged decision makers had a retaliatory animus? And the answer is that there is none. As far as I can tell- You know, one thing I think is really problematic is that the whole Flores meal break thing was not in Mr. Stoll's termination letter. I mean, that really, I think, is a real problem for your case. It looks like they're kind of scrounging around based on the emails. What can we get on him when he makes the complaint before the July 19th warning letter? And then when he's terminated, you didn't even cite in the letter what you claim is the main reason, violating the law here. Yeah, you're correct that it isn't in the letter. I think that's explained a couple of ways. One is that Araceli Burkett, she did the investigation. She made the decision that he should be terminated and communicated that to Schrock, and then asked Schrock to draft the termination letter. And the reason she did that is because in her own performance review, her writing was identified as an area that was not up to par. And so when he drafts the letter, I think when you look at his email, the reason that he emphasized the behavioral issues is because he felt it tied in with the July 2019 written warning and showed that they were engaged in progressive discipline on that issue. Is Schrock aware of the meal break, falsification of the lunch break for an issue? Yes. When the issue first came up, Burkett contacted Schrock and said, Flores has made this allegation. But then he put it in the letter. Is that not the basis for his termination? It is the basis for the termination, and it's reflected in the record, actually. So when he was suspended, first of all, the suspension specifically notes that he's been suspended pending investigation into the Flores allegation. And then Burkett's notes on the investigation, which were made contemporaneous with the investigation, specifically states that he's being terminated for two reasons. The behavioral issues that had not been corrected since the July 2019 warning and the directive to Flores to falsify her time records. Would it have been better if it was in the termination letter? Of course it would. But it's not an indication that there was a retaliatory animus or that there is... Why is there a dispute of fact on this issue? Let's just go to the jury. Well, Your Honor, it's not a dispute of fact. We acknowledge that it's not in the letter, but there's no genuine dispute that the Flores... A reasonable jury could say, the Flores issue is not why they terminated him. Why they terminated him is what they put in his termination letter. These are heads of HR that are preparing that letter. They know what they're supposed to do. And so why can't this go to the jury then to make that determination of whether that constitutes retaliatory motive or not? Well, Your Honor, I think the law is, and there are cases that are cited, that having an additional reason for a termination that's not communicated to an employee at the time of termination is not evidence of pretext. It's not evidence that an improper motivation motivated the decision. That's the Valamont decision that's cited in our brief, a Ninth Circuit decision from 2011, affirming summary judgment on FIA claims. And then there's the Merrill v. Aloha Island Air, 281 F. 3rd, 1054, which explains that pretext is not shown when an employer supplements its explanation for a termination decision. There's no requirement that all of the reasons for a termination be explained to an employee when they're terminated. And the failure to do so doesn't raise an issue of pretext or suggest that an improper motivation was the actual motivation for the termination. And I think the evidence here in the record is clear that the Flores instruction was a reason for the termination. As I said, it was part of the suspension notice. It was the focus of the notes that Burkett wrote explaining the reasons for the termination included the Flores direction. But what do we do with the fact that Ms. Flores herself was terminated for time card fraud? I mean, doesn't that at least cast some doubt as to whether any of this was legitimate? No. I mean, the inquiry is, did the decision makers have a reasonable good faith belief that Stoll made the instruction to Flores to falsify the time records? Now, if something happens subsequent to that, over a year later, where Flores herself was found to have engaged in time theft and was terminated for it, it doesn't alter the good faith belief that existed at the terminated Flores later on when she engaged in somewhat similar behavior is a point in the company's favor. It doesn't detract from the original decision or indicate that there was not a good faith belief. I don't even think it indicates that Flores was dishonest in her um, you know, in her interviews with Burkett or that it indicates anything that a retaliatory animus motivated the decision. Couldn't all of these reasons have played a role in his termination? Perhaps the company found him to be arrogant and difficult. Also, you know, found him, didn't like the fact that he was complaining of labor code violations. And maybe, you know, a lot of times companies fire people for many reasons. And maybe here there's some that are lawful, some that were not lawful, or at least the jury should decide that. Um, sure, there can be multiple reasons why an employer terminates the money. And I think that's the point of the Lawson framework, where, you know, a retaliatory animus only has to be a contributing factor. The problem here is that there's no evidence that any decision maker was motivated by his protected activities. As far as I can tell, when it comes to Kurt Schrock, the only allegation here is that Schrock orchestrated that July 2019 written warning to retaliate against Stoll for his protected activities. But that is a completely conclusory allegation. There is nothing in the record that supports that whatsoever. And there's no other indication or evidence or allegation that Schrock had a retaliatory animus. I think plaintiff concedes that Burkett did not have a retaliatory animus. And there's no evidence that Petrosky had a retaliatory animus. Does Schrock typically write termination letters for employees? It's not reflected in the record. I don't have the answer to that. All I can say is that in this particular instance, Burkett asked him to write the letter because in her own performance review, her writing was identified as something that was not up to par and that she needed to work on. Let me turn to the temporal proximity issue and address that. I think even the cases cited by plaintiff acknowledge that temporal proximity is not always alone by itself enough to raise an inference of retaliation. The Stiegel case cited by plaintiff acknowledges that timing standing alone may be insufficient to raise a genuine issue of retaliatory motive. In that case, however, the court noted that they weren't relying solely on temporal proximity and there was substantially more. In the Sampson case cited by plaintiff, the court acknowledged that California courts have ruled that temporal proximity does not, without more, suffice to show a triable issue of fact for a retaliation claim. The Dawson case cited by plaintiff, there was more than temporal proximity there. The plaintiff in that case, his protected activity was specifically referenced during his discharge meeting. And then there is the Kama case that we cited in our supplemental authority. That case recognizes that even in cases with very close temporal proximity, there's usually independent evidence of retaliation to show a causal link between protected activity and an adverse action. That case discusses other cases where the temporal proximity is short as two or three or four days, but additional evidence existed to indicate that the decision makers were motivated by a retaliatory animus. And then Kama explains that, look, temporal proximity is complicated in a situation like this where you have a protected activity that's then followed by misconduct that forms the reason for an adverse action. And in those situations, essentially, the causal link is broken or weakened or not present. And you can't say one way or the other whether temporal proximity raises an inference of retaliatory animus. Let me jump in if I could. So I'm looking at the district court's order 1 ER 37. That's where the district court discusses temporal proximity. And if I'm, I just want to make sure I'm not missing anything. So I'll give you a moment to again, and I'm on page 1 ER 37. And when you're there. Okay. All right. So in the first full paragraph on that order, the district court mentions Stoll nonetheless contends that the causal link between his protective activity is demonstrated by the time between his meeting with Petrovsky and his termination. I don't really see the district court engaging in the analysis you just did. I don't see the district court saying, well, there are these cases that say temporal proximity, but that's why they don't apply here. The district court just kind of says, never really mentions temporal proximity again. It just says that he hasn't made the case, but doesn't explain why the temporal proximity is not enough. Is there somewhere else in the did engage in the analysis you just did that I'm missing or did just, is this it here? Well, two things. One, I think in the court's discussion of the facts, they recognize the same timeline that you described during the plaintiff's portion of the argument. And he doesn't explicitly state that, look, because of the way the timeline works out with the misconduct following the protected activity, that that eliminates any inference of retaliation. But, you know, I think it's probably implicit in this decision. And this court can affirm on any basis that exists in the record, even if it wasn't addressed by the district court. Now, we're certainly not stuck with what the district court did. You're right. I just want to make sure that, so your best reading of the order would be we should incorporate the beginning of the order where it goes to the timeline. And when we're reading the final paragraph, we have to read it in the context of what the district court said earlier. Yes, I think that's correct. And I think you can apply the law as you see it to the undisputed material facts, even if the court didn't specifically address it itself. I mean, look, the other issue here is that, you know, this temporal proximity issue wasn't really raised by the plaintiff clearly in her opposition brief either, which probably explains part of the reason why it was not addressed more by the district court in its decision. I'm running short on time here. Can I just ask you a question? The cause of action that I am having some difficulty with is the national origin discrimination. So from what I can tell, it looks like there are three pieces of evidence. Number one, that Canadians who were hired in 2014, 2015 look like they're fired by 2020, although we don't really have reasons for why various people were fired other than Mr. Stoll and what Mr. Patel says, which is very vague. The fact that we have these three Hispanic supervisors who report to Mr. Stoll not being fired. And then we have the Crawford and Bodie statements that, like, you don't understand you're not Canadian, you're Canadian, which I don't really find that last one persuasive because it's clear Bodie and Crawford were not involved in the termination. It doesn't look, I can't see any link between those statements and the termination. And then, like Judge Lee said, that because Mr. Stoll didn't provide any context for those statements, we don't know what they were talking about, right? But I'm wondering the standard is so low, right? The prima facie case, you know, minimal evidence is enough. Is there enough here just because the standard is so low, is my question, for this claim to survive, even if it looks like a, you know, not the strongest claim around, I'll put it that way. Yeah, so there's not enough here to even meet the fourth element of the prima facie case, which requires the plaintiff to cite evidence that raises an inference of discrimination on the basis of national origin. Here with the Bodie and Crawford comments, there's no indication that those were communicated to any decision maker that any decision- What about the firing of all the Canadians over a six-year period? That doesn't look like they're trying to get rid of all the on their own. They were not terminated. Those who- At least one of them thought he was going to be, right? A preemptive resignation. That's what Stoll alleged in his deposition, but there's no indication about why he resigned, what was the issue that he thought he was about to be terminated over, whether there was any evidence that any of that involved his national origin whatsoever. Was there any discovery taken into all the Canadians and why they were terminated? Well, the only one that was addressed during discovery was Patel, and in that case, it was somewhat minimal. What the evidence indicated was that he had performance issues, that those were addressed in a PIP soon before he was terminated, and that when the- PIPs. A PIP, I'm sorry, Performance Improvement Plan. Improvement Plan. I remember those. Thank you. So he had a PIP, and then he was terminated shortly after the PIP expired because the issues still continued. There's no evidence that his national origin played a role in that decision. There's no evidence that any of the alleged decision-makers in this case were involved in the Patel case. The only indication there is that national origin played a role at all is Patel's own conclusory statement that he thinks he was terminated because he was Canadian, but there's no evidence at all to support that. So to answer your question, no, there's not even the minimal evidence needed to raise an inference of national origin discrimination, and even if there was, moving to the third step of the McDonnell-Douglas framework, there's no evidence that any of the reasons for terminating Stoll were a pretext for national origin discrimination. All right. Thank you very much, counsel. Thank you. I want to work backwards. So my colleague just mentioned that in the Patel termination that they weren't the same players, and that's not what the record reflects. The record reflects in the deposition of Mr. Patel. He said that the decision came from corporate HR, the same corporate HR who made the decision here to terminate Mr. Stoll, and that also goes back to the conversation that was just had about Mr. Schrock writing the termination letter and why it was him and not Ms. Burkett. That was in the deposition of Mark Petroski, who said that the decision to terminate Mr. Stoll came from HR, I'm sorry, corporate HR, not from Burkett, who was local HR. I also want to direct your attention to the degree that Patel worked at a facility across the country and had different supervisors, right? Yes, but he testified that corporate HR called him and told him that he's going to be terminated, and he also testified in a very similar pattern. Shortly before his termination, he was put on a performance improvement plan, and things that were non-issues all of a sudden became issues, just like the pattern of what happened with Mr. Stoll. I also want to bring your attention to the fact that the time fraud allegations, there was a discussion you just had about that not being in the termination letter, and there's an explanation offered for that, but there's also another document, the internal change of employment status document. That is an internal document within the company that's only for the company, where the reason for termination says threatening of coworkers. That's what it says. It doesn't say that this decision was based on the time fraud allegations, and that's their internal document. If I may continue. Well, no, actually, I think we need to wrap unless you have a question. Go ahead. Just one question, just very briefly. It's the sham affidavit issue. In his declaration, he added the detail of Mr. Cripps telling him that people who complain are viewed as troublemakers. I didn't see in the declaration. Is there an explanation why he remembered this detail in the declaration but not in the deposition? No, that's not in his declaration, and I don't think that that even needs to be in there because the testimony is along the same exact line as to what he was testifying to. All right. Thank you, counsel, for your briefing. I have another interesting case. I did not know much about the meat packing industry, and now I feel like an expert myself. So this matter is submitted, and we are done for today. Thank you.
judges: OWENS, LEE, KOH